UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: | Bankruptcy No. 07-30750 |
| Dam Huynh and Trinh Duong, | Chapter 7 |
| Debtors. / | |
| Kip M. Kaler as Bankruptcy Trustee, | |
| Plaintiff, | |
| vs. | Adversary No. 08-7003 |
| Dam Huynh and Trinh Duong, | |
| Defendants. / | |

**MEMORANDUM AND ORDER**

By Complaint filed February 4, 2008, Kip M. Kaler, the Chapter 7 bankruptcy trustee in this case, initiated this adversary proceeding seeking a determination that Debtors/Defendants Dam Huynh and Trinh Duong are not entitled to a discharge pursuant to 11 U.S.C. § 727 (a)(2), (3), (4) and (5). Debtors filed an Answer on March 4, 2008, denying the allegations.

The matter was tried on June 19, 2008. The following constitutes the Court's findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

Debtors were born and married in Vietnam. They immigrated to the United States in approximately 1995 bringing at least one child with them, who was a minor at the time. Debtor Dam Huynh is 61 years old and Debtor Trinh Duong is approximately 60 years old.[1] Debtors do not speak, read or write English. Debtor Dam Huynh was in the army in South Vietnam prior to

---

[1] Debtor Trinh Duong does not know the exact date of her birth but believes she was born in 1948.

immigrating to the United States and has no education. He has worked various labor jobs in the United States including farming beets, welding, maintenance and janitorial work. He currently works as a janitor at Pan-O-Gold Baking Company. Debtor Trinh Duong works as an assembler at Fargo Assembly. Debtors do not have any specialized training or financial education.

Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 6, 2007. In their bankruptcy petition, Debtors list total unsecured debt of $172,570.42 owed to 44 creditors. The majority of Debtors' unsecured debt relates to credit cards.

A creditors meeting was held on October 4, 2007. Debtors appeared with their bilingual adult daughter to translate for them. At the meeting, Debtors disclosed information relating to property transfers that they had not previously disclosed in their bankruptcy petition. Specifically, Debtors disclosed that they transferred jewelry they purchased on credit from Wimmer's Jewelry and property purchased on credit from Slumberland Furniture to various individuals. The trustee continued the creditors meeting and asked Debtors to provide more information regarding the transfers including the names of the individuals to whom they transferred the property. The trustee also asked Debtors to provide documentation relating to all their accounts. He was particularly concerned with cash withdrawals from credit card accounts.

Debtors filed an amended Statement of Financial Affairs on October 18, 2007, disclosing gambling losses estimated at $100,000.00 and five transfers including money, jewelry, and gold from February of 2007 through April of 2007. Debtors did not disclose any property transfers relating to furniture in their amended Statement of Affairs.

**A. Credit Cards and Account Statements**

After the trustee requested information relating to Debtors' credit card statements, Debtors' daughter wrote a letter to each of Debtors' creditors requesting account statements in an attempt to

2

comply with the trustee's request for more information. Debtors' daughter also made efforts to contact Debtors' creditors via telephone. Many creditors would not release any information to Debtors' daughter because she was not named on the accounts. Debtors only received account statements from two of the forty-four creditors prior to trial and provided them to the trustee.[2]

At the continued creditors meeting on November 16, 2007, Debtors informed the trustee that they were having difficulty getting account statements from creditors and suggested he may have more success. Debtors offered to sign any authorizations he needed. The trustee did not prepare authorizations or send letters to any of Debtors' creditors.

At the trial on June 19, 2008, an uncertified Vietnamese interpreter translated Debtors' testimony. Debtor Dam Huynh testified that he received his first credit card in approximately 2000. When he began receiving more credit card applications in the mail, Debtor Dam Huynh asked a coworker to fill out the applications for him. He testified that he understood that when he bought something on credit that he had to pay it back and that he intended to do so. By June or July of 2007, however, his debt was well over $100,000.00. He was receiving numerous calls from creditors, and he realized that he could not pay them back. Debtor Dam Huynh testified that he did not keep any documentation of his finances. He testified that he threw away the credit card statements he received because he could not read or understand them.

**B. Gambling**

Debtor Dam Huynh claims the majority of his unsecured debt is due to a gambling addiction. He testified that he gambled on weekends at area casinos including Shooting Star Casino in Mahnomen, Minnesota, and Dakota Magic Casino in Hankinson, North Dakota. He played blackjack on weekdays at local establishments including Holiday Inn, Expressway Inn, and

---

[2] Debtors received account statements from another creditor the day of the trial.

3

Playmakers. He testified that he took numerous cash advances from various credit cards to fund his gambling habit and to pay outstanding bills. He thought that he would eventually win big and be able to pay back his credit card debt. He also used his employment income to pay his credit cards. Debtor Dam Huynh has not sought treatment for his gambling addiction and testified that he is trying to control himself.

At the trial, the trustee called two casino employees to challenge Debtors' gambling addiction claim. Larry Kinseth, Chief Financial Officer of Shooting Star Casino, testified that the casino has a rewards program for patrons. The rewards program allows patrons to earn points by spending money at the casino. Patrons can redeem points for amenities such as hotel rooms, meals, limousine rides and show tickets. The rewards program tracks money spent and paid out gambling when the card is used by the card member. The rewards card can be put in slot machines, swiped at card tables, or used with pull tabs and bingo. Kinseth testified that use of rewards card is discretionary and players are not required to use their cards. He testified that some players want to remain anonymous and do not want people to know how much they gamble.

Both Debtors enrolled in the rewards program in 2002. When Debtor Dam Huynh used his rewards card from 2002 through 2007, he sustained an actual loss of $8,716.95. When Debtor Trinh Duong used her rewards card from 2002 to 2005, she sustained an actual loss of $1,264.22.

Kinseth further testified that the casino employs hosts to watch players on the slot machines and pit masters to watch high level players at their table games. Kinseth testified that Debtor Dam Huynh was not being watched or "tracked" by the hosts or pit masters. Kinseth testified it is possible for a player to lose $100,000 in five years and, indeed, there are players who lose more. He testified that Debtors could have lost $50,000 in the casino without any casino employee noticing but believes losing that much money would have drawn attention.

Andrew Gaukler, Supervisor of the Dakota Club at Dakota Magic Casino, testified that Dakota Magic Casino also has a rewards program and that its tracking system, point system and redemption perks are similar to those at Shooting Star Casino. Gaukler testified that the rewards card is also similar to Shooting Star Casino's rewards card in that it is solely within the player's discretion to use or not use the card. Gaukler testified that when Debtor Dam Huynh used his rewards card, he sustained an actual loss of $2,290.74 in 2006 and $238.32 in 2007.[3] Gaukler also testified it is possible that Debtors could lose $50,000 without being noticed.

Debtor Dam Huynh testified that he used his rewards cards only 10% of the time.

**C. Property Transfers**

At the trial, Debtors testified that they transferred money to at least two individuals and also bought various items such as furniture, jewelry and gold on credit and later transferred it to other individuals. Debtor Dam Huynh explained that there are many people of Vietnamese descent who gamble at the casinos and this is who they sold some of the property to. Debtors testified they only knew the first names of some of the people they sold property to and they did not know the names at all of others. Debtor Dam Huynh testified that he thought it was okay to use credit cards to buy property and then sell it for money to gamble.

**1. Money Transfers**

In their amended Statement of Affairs, Debtors disclosed a money transfer of $3,500.00 to Anthony Huynh and a money transfer of $3,700.00 to Minh Kui. Debtor Dam Huynh testified that he owed these individuals the money and paid them in full within the last year.

---

[3] Dakota Magic Casino's records also indicate that an account belonging to Thi D. Duong sustained an actual loss of $59.55 in 2006. Gaukler testified he was uncertain whether these records related to Debtor Trinh Duong.

5

### 2. Furniture Transfers

At the creditor's meeting, Debtors discussed property transfers relating to furniture that were not disclosed in their petition. When Debtors amended their statement of affairs, Debtors did not disclose any property transfers relating to furniture. Debtors provided testimony at the trial affirming they transferred furniture. Debtor Trinh Duong testified that Debtors initially purchased the furniture for their own personal use and later sold some of the furniture to individuals for cash or to repay a past debt. She testified that the remainder of the furniture purchased on credit remains in their possession. In conflicting testimony, Debtor Dam Huynh testified that he gave two individuals, Hien and Minh, a credit card in his name to pick out and purchase furniture for themselves on his credit.

### 3. Jewelry Transfers

In their amended Statement of Affairs, Debtors also disclosed two transfers of jewelry: a transfer of "Loose Round Hearts on Fire Diamond Ring" to "Tu ?" for $3,000.00 and a diamond ring for $1,000.00 to Vietnamese Jewelry Store. In testimony relating to jewelry transfers, Debtor Trinh Duong testified that she purchased jewelry for their own personal use and that on five or six occasions, she sold jewelry to individuals she met at the casino to get cash to gamble or to repay debts. Debtor Trinh Duong testified that she sold the property for much less than it was worth and that at least two of the transactions took place in 2007.

### 4. Gold Transfer

Debtors disclosed a transfer of Vietnamese gold for $400.00 to Vietnamese Jewelry Store in their amended Statement of Affairs. Debtor Dam Huynh testified that he bought the gold for $4,800 to sell for money. He does not recall who he sold the gold to but remembers they were from Canada and they purchased the gold for $400 or $500.

6

## II.  CONCLUSIONS OF LAW

The trustee seeks to have Debtor denied a discharge under 11 U.S.C. § 727(a)(2), (3), (4) and (5).  Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received or attempted to obtain money, property, or advantage, or a promise of money, property or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a).

7

Denying a debtor a discharge is a drastic remedy. Kaler v. Geller (In re Geller), 314 B.R. 800, 806 (Bankr. D.N.D. 2004). In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party with the burden of proof resting squarely upon the latter. Id. The standard of proof is a preponderance of the evidence. Id.

**A.    Section 727(a)(2)**

The elements essential to barring a discharge under section 727(a)(2)(A) are:

> (1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

Korte v. United States (In re Korte), 262 B.R. 464, 472 (B.A.P. 8th Cir. 2001); Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996).[4]

Debtors' conduct at issue under section 727(a)(2)(A) is the transfer of their furniture, jewelry, and gold. Debtors testified that they bought the property with their credit cards and transferred it to various individuals for cash and that five of the transfers were within one year of their bankruptcy filing. The first three elements under section 727(a)(2)(A) are met.

The remaining issue, therefore, is whether the transfers were made with an intent to hinder, delay or defraud. Debtors rarely admit to a fraudulent intent, and parties seeking denial of a debtor's discharge must generally rely on a combination of circumstances that suggest that debtor harbored the necessary intent. Kaler v. Schrader (In re Schrader), 2006 WL 4392771, at *5 (Bankr. D.N.D

---

[4] The elements under section 727(a)(2)(B) are substantially the same except that the plaintiff must prove that the debtor transferred or concealed property of the estate after the bankruptcy petition was filed. Fokkena v. Juehring (In re Juehring), 332 B.R. 587, 591 (Bankr. N.D. Iowa 2005). Debtors' conduct following their bankruptcy filing is not at issue. Section 727(a)(2)(B) is therefore not at issue in this case.

8

August 11, 2006). Courts consider several factors in determining whether a debtor acted with intent to hinder, delay or defraud: (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry. MWI Veterinary Supply Co. v. Rodgers (In re Rodgers), 315 B.R 522, 531 (Bankr. D.N.D. 2004).

In this case, the only factor that suggests Debtors had an intent to defraud is the inadequacy of consideration when the property was transferred. Debtors conceded that they sold their property for much less than it was worth. None of the other factors are present in this case. Debtors' conduct and testimony indicates that they transferred the property to get cash to gamble with the intention of striking it big or winning the jackpot in order to pay their overwhelming debt. Although some of the Debtors' testimony is conflicting, Debtors consistently testified that the transfers were motivated by a need for cash to gamble. Debtors attempted to stay afloat with their quickly accumulating debt, not to hinder, delay or defraud a creditor or the trustee.

Denial of discharge is not warranted under section 727(a)(2).

**B.    Section 727(a)(3)**

A debtor may be denied a discharge pursuant to section 727(a)(3) for failure to keep or preserve records from which his financial situation may be ascertained unless the failure is justified under all the circumstances of the case. Riley v. Riley (In re Riley), 305 B.R. 873, 882 (Bankr. W.D.

9

Mo. 2004). Debtors are required to keep adequate financial records to enable parties and the court to trace the debtor's financial history, reconstruct financial transactions, and test the completeness of the disclosure requirements. Fokkena v. Huynh (In re Huyhn), 379 B.R. 865 (Bankr. D. Minn. 2008). Intent is not an element of this ground for denial of discharge; the standard imposed is one of reasonableness. In re Riley, 305 B.R. at 882. Discharge should not be denied if the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition. Id. Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of them. Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005). The complaining party must make an initial showing that the debtor failed to maintain and preserve adequate records and that the failure makes it impossible to ascertain the debtor's financial condition and material business transactions. Id. If the debtor breaches his duty to his creditors to keep adequate records, he is given the opportunity to provide some justification for the breach. Id. If the debtor cannot justify his failure to keep adequate records, discharge will be denied. Id. "What constitutes adequate records must be decided on a case-by-case basis." Hillis v. Martin (In re Martin), 124 B.R. 542, 543 (Bankr. N.D. Ind. 1991).

In his Complaint, the trustee alleges that Debtors failed to maintain adequate records showing how $172,570.42 in unsecured debt was obtained and where the cash advances from the various credit cards were spent the year prior to filing for bankruptcy. In order to help him understand where the money went, the trustee requested that Debtors explain how the money was spent and provide credit card statements. The explanation provided by Debtor Dam Huynh was that he threw away the credit card statements he received, because he could not read or understand them. In an attempt to meet the trustee's continued requests for more documentation, Debtors' daughter

wrote letters to each of Debtors' creditors requesting statements and attempted to contact them via telephone. Many creditors would not release any information to her because she was not named on the accounts. Debtors attempted to get statements from creditors to no avail. Debtors received only two account statements and willingly provided those statements to the trustee. Debtors informed the trustee that they were having difficulty getting documents from creditors and suggested he may have more success. Debtors offered to sign any authorizations he needed. The trustee did not prepare authorizations or send letters to any of Debtors' creditors.

Debtor Dam Huynh also testified that he has a gambling addiction and that he took cash advances from his various credit cards to gamble. Debtor testified that he was not given receipts at the various casinos or bars where he gambled. Although the trustee called two casino employees to testify in an attempt to show Debtors' gambling was nominal, the rewards card tracking systems only allow for the casino to track gains and losses at any specific table or machine when Debtors actually used the optional rewards cards. Debtors' use of the cards was completely discretionary and Debtor Dam Huynh testified that he used his rewards cards only 10% of the time. The extent of Debtors' gambling cannot be gauged solely by the minimal use of the casino rewards cards, and it is unreasonable to expect Debtors to provide documentation of all the other times they gambled simply because they did not use the rewards cards. However, Debtors are left with minimal documentation as to where any of the money went. The Court finds that the trustee has met his burden of proving that Debtors failed to keep adequate records from which their financial condition could be ascertained.

Because the trustee has met his burden of proof, the burden shifts to Debtors to offer some justification for their failure to keep adequate records. Floret, L.L.C. v. Sendecky, (In re Sendecky), 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002). In order to determine if that failure was justified, the Court

must determine what records someone in similar circumstances would keep. See id. Some factors to consider include the debtor's education, sophistication, and business experience, size and complexity of the debtor's business, the debtor's personal financial structure, and any special circumstances that may exist. Middlefield Banking Co. v. Kassoff (In re Kassoff), 146 B.R. 194, 200 (Bankr. N.D. Ohio 1992). Here, Debtors are very uneducated. They have no specialized training nor are they business people. They do not speak, write, read or understand English. In this particular case, the Court does not believe that Debtors intended to hinder the trustee's efforts. Due to their complete lack of financial sophistication and their inexperience in the world of financing, credit cards and secured loans, it is not surprising that Debtors cannot provide any documentation or sufficiently detailed explanations showing how $175,000 was spent and/or gambled. Debtors explained their failure to keep records. Although the lack of documentation leave Debtors without an adequate explanation for the loss of their assets, as discussed below, their failure to keep records does not warrant a denial of discharge under section 727(a)(3).

**C.    Section 727(a)(4)**

A debtor may be denied a discharge pursuant to section 727(a)(4)(A) if the debtor knowingly and fraudulently, in or in connection with a case, made a false oath or account. In order to deny a debtor a discharge under this subparagraph, a plaintiff must establish that: (1) the debtor knowingly and fraudulently; (2) in or in connection with the case; (3) made a false oath or account; (4) regarding a material matter. Korte v. United States (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001). A debtor's signatures on the petition, made under penalty of perjury, are declarations which have the force and effect of oaths of the kind encompassed by the discharge exception for making a false oath. Jordan v. Bren (In re Bren), 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004) (overruled on other grounds). The proper functioning of the entire bankruptcy process is dependent upon debtors

12

providing complete, accurate and reliable information in the petition and other documents submitted with the filing of the case so that parties in interest may evaluate debtors' assets and liabilities and appropriately administer the case. Id. Courts are often understanding of a single omission or error resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive. Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004). A debtor, however, has an absolute right to amend his or her schedules. See Fed. R. Bankr. P. Rule 1009(a).

At issue here is whether Debtors "knowingly and fraudulently" made a false oath. Debtors pleaded ignorance and an innocent mistake when they did not disclose their gambling losses and multiple property transfers in their bankruptcy petition. When the property transfers were revealed at the creditor's meeting and the trustee requested additional information, Debtors amended their Statement of Affairs and disclosed five property transfers prior to the continued creditor's meeting. Although Debtors' amended Statement of Affairs did not reflect the furniture transfers discussed at the creditor's meeting and all five or six of the jewelry transfers testified to at trial, it is not clear whether all the transfers were within one year preceding the bankruptcy filing. Debtors attempted to comply with the trustee's request. Debtors' initial omissions of their gambling losses and property transfers in their petition appear to be a product of the language barrier. In this case, the omissions on the Statement of Affairs appear to be sloppy accounting or a consequence of a lack of understanding and not an attempt to obfuscate the truth.

A debtor may be denied a discharge pursuant to section 727(a)(4)(B) if the debtor presented or used a false claim. Section 727(a)(4)(C) allows for denial of a discharge if the debtor gave, offered, received or attempted to obtain money, property, or advantage, or a promise of money,

13

property or advantage, for acting or forbearing to act. The trustee does not argue that Debtors should be denied a discharge under either of these subsections.

A debtor may also be denied a discharge pursuant to section 727(a)(4)(D) if the debtor withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs. In this case, Debtors did not keep any account statements or records of their financial affairs but rather, threw them away upon receipt. Further, Debtors requested the trustee's assistance in obtaining account information from creditors when their efforts failed. There is no evidence that Debtors withheld any recorded information.

Denial of discharge is not warranted under section 727(a)(4)(A) or 727(a)(4)(D).

**D.  Section 727(a)(5)**

Section 727(a)(5) provides that a debtor's discharge may be denied if he or she has failed to explain satisfactorily any loss or deficiency of assets to meet his or her liabilities. Section 727(a)(5) does not contain an intent element as part of its proof, and what constitutes a "satisfactory" explanation is left to the discretion of the Court. In re Riley, 305 B.R. at 885. As the party objecting to discharge, the trustee has the burden of proving that a loss of assets actually occurred. See id. Once that burden has been met, it is incumbent upon Debtors to provide a satisfactory explanation for the loss of the assets. See id. A debtor cannot offer a justification for failure to satisfactorily explain the loss of assets under section 727(a)(5) and it is within the court's discretion as to whether the loss of assets has been satisfactorily explained. Stapleton v. Yanni (In re Yanni), 354 B.R. 708, 716 (Bankr. E. D. Pa. 2006). For a debtor's explanation to be satisfactory, it must "convince the judge that the debtor has not hidden or improperly shielded assets . . . . General assertions that money was spent on living expenses or lost through gambling, without documentation, are

14

unacceptable." Carter Engineering Co. v. Carter (In re Carter), 236 B.R. 173, 180-1 (Bankr. E. D. Pa. 1999).

The Court finds the recent case of Fokkena v. Huynh (In re Huyhn), 379 B.R. 865 (Bankr. D. Minn. 2008), to be particularly illustrative. In In re Huyhn, the debtor incurred more than $300,000 in unsecured debt using her credit card and bank accounts for cash advances and to purchase personal property that was sold for cash at steep discounts to fund an alleged gambling addiction. 379 B.R. at 872. The court held that without any corroborating evidence, the debtor's explanation was no more than a naked assertion. Id. at 874. The court referenced the many forms of documentation acceptable to the Internal Revenue Service to document gambling losses as examples of acceptable corroboration in bankruptcy cases. Id. (citing Rev. Proc. 77-29, 1977 WL (IRS RPR), 1977-2 C.B. 538). An accurate diary or similar record regularly maintained by the taxpayer and supplemented by verifiable documentation will usually be acceptable evidence for substantiation of wagering winnings and losses. Id. Verifiable documentation for gambling transactions includes, but is not limited to: wagering tickets, canceled checks, credit records, bank withdrawals, and statements of actual winnings or payment slips provided to the taxpayer by the gambling establishment. In re Huyhn, 379 B.R. at 874. A diary and documentation generated with the placement and settlement of a wager should be further corroborated with other documentation of the debtor's wagering activity or visit to a gambling establishment when possible. Id. This may include hotel bills, airline tickets, gasoline credit cards, canceled checks, credit records, bank deposits, and bank withdrawals. Id. Affidavits or testimony from responsible gambling officials regarding wagering activity are also considered additional supporting evidence. Id.

In this case, the trustee has shown the loss of assets through Debtors' own admissions. Therefore, the burden of proof shifts to Debtors to satisfactorily explain to this Court the loss of

assets.  See In re Huyhn, 379 B.R. at 874. This case is analogous to In re Huynh, in that Debtors' explanation is that the majority of the money was simply lost to gambling.  Debtors are unable to offer any form of documentation or corroboration to account for the losses.  As in In re Huynh, this Court is asked to take Debtors' word and nothing more as an adequate explanation. Due to the circumstances of this case,  the Court deems Debtors' explanation unsatisfactory and inadequate, and denial of discharge is warranted under section 727(a)(5).

Based on the foregoing, Debtors Dam Huynh and Trinh Duong are DENIED a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(5) for failure to adequately explain the loss of assets.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated August 1, 2008.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**